UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHANE D. HUTCHINS, an individual,<br><br>    Plaintiff,<br><br>        v.<br><br>DIRECTV CUSTOMER SERVICE, INC.,<br>and JOHN/JANE DOES I through X, whose<br>true identities are presently unknown,<br><br>    Defendants. | Case No. 1:11-CV-422-REB<br><br>**MEMORANDUM DECISION,<br>FINDINGS OF FACT, AND<br>CONCLUSIONS OF LAW** |

## BACKGROUND

Plaintiff Shane Hutchins ("Hutchins") was employed by Defendant DirecTV Customer Service, Inc. ("DirecTV") in a "call-center," located in Boise, Idaho. While employed, he filed a charge of employment discrimination with the Idaho Human Rights Commission. While the charge was being investigated, and after Hutchins had sought the assistance of co-employees in supporting his claim, Hutchins was fired. Hutchins alleges that his firing was retaliation for his engaging in protected activity under the American with Disabilities Act, *i.e.* bringing, and investigating, his claim of discrimination. DirecTV contends that it had an honest, good faith reason for terminating Hutchins because he was intimidating fellow employees as part of his efforts to support his claim.

A three-day bench trial was held from January 13 through 15, 2014. These individuals testified: Shane Hutchins, Matthew Sparks, Dr. Tyler Bowles, Donna Bickler, Dennis Buffaloe,

**MEMORANDUM DECISION, FINDINGS, AND CONCLUSIONS - 1**

Justin Sturgeon, Jeremy Punches, and Cornelius Hofman.

The case was well-tried, by counsel who were prepared and capable advocates. The Court has carefully considered the argument of counsel, the testimony of witnesses, the exhibits admitted, and has weighed and compared the particulars of such argument and evidence. The Court must measure the evidence, as it has done here, to draw findings of fact and conclusions of law as to how the Court is persuaded, or not persuaded, by the argument and evidence presented at trial, as to how the evidence is considered against the legal standards setting out the elements Hutchins must prove to succeed on his claims, and as to the burden of proof he must meet, or DirecTV must meet, in seeking to prevail upon such claims, or upon affirmative defenses raised as to such claims. Those findings and conclusions are set out to follow.

In summary, the Court rules that DirecTV terminated the employment of Hutchins in retaliation for engaging in protected activity, and that such termination violated provisions of federal law found at 42 U.S.C. § 12203(a) and Idaho law found at I.C. § 67-5911. That is, but for Hutchins' protected activity, he would not have been terminated. The Court is not persuaded that DirecTV had a sufficient, honest, good faith reason for terminating Hutchins, so as to insulate its decision to fire Hutchins from a claim of retaliation.

Discussed in detail *infra*, the Court finds that Hutchins did request a letter of support from current and past co-employees. His doing so was protected activity, including his contact with Donna Bickler, whose negative reaction to Hutchins' request of her, along with the fact that his request came contemporaneously to a semi-annual employee review period, ultimately led to Hutchins' firing. DirecTV's reliance on Ms. Bickler's subjective and unjustifiably negative reaction to Hutchins' interaction with Ms. Bickler was not justified given the broad protection

**MEMORANDUM DECISION, FINDINGS, AND CONCLUSIONS - 2**

afforded individuals by the ADA's anti-retaliation provision. Accordingly, the Court finds that an award of back pay, and the value of related benefits, will be made for the benefit of Hutchins.

## THE PARTIES

1.      Shane Hutchins is a former employee of DirecTV. At all relevant times, he was a resident of the State of Idaho.

2.      DirecTV is a corporation registered to do business and doing business in the State of Idaho. At all relevant times, DirecTV employed greater than 500 employees in each of the 20 or more calendar weeks in the current or preceding calendar year.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this civil action based on federal question jurisdiction, pursuant to 28 U.S.C. § 1331, and 42 U.S.C. § 2000e-5(f)(3), and supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this District, pursuant to 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment practice is alleged to have been committed here.

3.      The parties stipulated to have the Court act as factfinder on the claims at issue. (Dkts. 67, 70.)

## FINDINGS OF FACT

1.      Hutchins was employed by DirecTV from October 18, 2004 through August 10, 2010. At the time of his termination, he was employed as a "Team Manager," a mid-level management position in the Boise customer care call center.

2.      On May 11, 2010, Hutchins filed a complaint of discrimination against DirecTV with the Idaho Human Rights Commission ("IHRC"), alleging a violation of the Americans with

Disabilities Act.  In particular, Hutchins claimed that he was discriminated against because of a physical disability stemming from irritable bowel syndrome and diverticulitis.  He alleged that DirecTV failed to accommodate his disability and discriminated against him by issuing employment warnings, placing him on a performance improvement plan, and passing him over for several promotions.

3.  DirecTV responded in writing to Hutchins' complaint in the ordinary course of the IHRC investigation into the complaint.  Subsequently, the IHRC wrote to Hutchins' counsel with a copy of DirecTV's response to the charge of discrimination.  In that June 25, 2010 letter, the IHRC asked that Hutchins and his counsel review the response and submit a rebuttal statement, including a request that Hutchins:

> . . .write down all of those things you disagree with, why you disagree with them and what evidence or information you possess which will support your position.  Include any documentation as well as any witness names, addresses and telephone numbers (if known) and a brief narrative of facts to which you believe each witness will testify.

Plaintiff's Ex. 1, Defendant's Ex. 500.

4.  After receiving this letter, and beginning around June 28, 2010, Hutchins contacted several current and former DirecTV co-employees and asked them to provide statements to support his claim of discrimination.  Among them were:  Nathan Lease, Jeremy Punches, Jennifer Norvell (formerly, Jennifer Arocha), Justin Sturgeon, Joshua Meyer, Eva Bowman and James LaMancha.

5.  At approximately 10:30 p.m. on July 7, 2010,  Hutchins approached Donna Bickler (another employee at DirecTV) at her work station, for the same purpose.  At the time,

Ms. Bickler was a "Team Leader" and "direct report" of Hutchins, meaning she was a direct subordinate of Hutchins, who was a "Team Manager."

6.    Hutchins told Ms. Bickler he would be taking a break later in the work shift and that he wanted to speak with her at that time in the nearby "team room."  When she later came to the team room on her own break (albeit at his request), Hutchins told Ms. Bickler that he had filed a claim of discrimination against DirecTV.  He elaborated upon his medical condition that was the underlying basis for the discrimination claim, and he then asked her to write a letter on his behalf describing that he was a good Team Manager.  He told her to keep their conversation confidential.  He also told Ms. Bickler that writing such a letter was not something she had to do.  In the conversation, his tone was even tempered and mild.

7.    Ms. Bickler's testimony regarding the contact Hutchins made with her is closely consistent with how both Justin Sturgeon and Jeremy Punches testified that Hutchins had contacted and talked with them, discussed *infra*.

8.    Hutchins denied contacting Ms. Bickler, but his testimony as to whether such a contact occurred was not at all credible.  In contrast, Ms. Bickler's account of the contact he made with her, and the content of their conversation, was entirely credible.  She had no reason to fabricate such a conversation and the details of the account track very closely with what others employees said about similar conversations they had with Hutchins.  Ms. Bickler had nothing to gain by not being truthful in her testimony and her version of the facts has remained consistent over time.  The Court finds that Hutchins asked Ms. Bickler to write a letter of support for his claim of discrimination.

9.      Later that evening following her conversation with Hutchins, Ms. Bickler became upset and could not sleep.  She felt Hutchins' request put her "in the middle" between Hutchins and DirecTV.  She became tearful and anxious.

10.     The following day at work, July 8, 2010, Ms. Bickler told her co-worker, Cheryl Wees, what had happened the prior evening and how upset she was. Ms. Wees was a Team Manager at DirecTV at the time.  Ms. Wees told Melanie Decker, who worked in the DirecTV Human Resources office, and Human Resources Manager Dennis Buffaloe, about what Ms. Bickler had told her.  Ms. Wees encouraged Ms. Bickler to talk to Human Resources.

11.     Ms. Bickler decided to meet with Mr. Buffaloe that same day, and when she did, she described her conversation with Hutchins.  Mr. Buffaloe felt that Ms. Bickler was very upset and gave her the rest of the day off.

12.     On July 9, 2010, Ms. Bickler e-mailed to Mr. Buffaloe a written summary of her July 7, 2010 conversation with Hutchins, at Mr. Buffaloe's request.

13.     On the morning of July 13, 2010, Mr. Buffaloe contacted Hutchins and took him to his office, where they were joined by Ms. Decker.  Mr. Buffaloe asked Hutchins if he had been soliciting letters from employees concerning the lawsuit that Hutchins had filed against DirecTV.  He told Hutchins that there had been a complaint made by another employee about such a request. The "complaint" apparently was Ms. Bickler's report to Mr. Buffaloe about her conversation with Hutchins, although Mr. Buffaloe did not identify the person making the complaint.

14.     July 13, 2010 was also the morning of the so-called "Calibration Review."  In the semi-

annual Calibration Review process, Team Managers (including Hutchins) and other higher level management employees consider, rate, and evaluate the Team Leaders, including those they do not directly supervise. The Team Leaders to be evaluated included Ms. Bickler.

15. Hutchins told Mr. Buffaloe that he might have contacted a former employee but would not say whether he had contacted any current employees.

16. Hutchins refused to answer further questions without talking with his attorney.

17. DirecTV placed Hutchins on paid administrative leave pending investigation of Ms. Bickler's complaint.

18. Later in the afternoon on the same day of July 13, 2010, Hutchins returned to the DirecTV workplace and spoke to Mr. Buffaloe. Hutchins gave Mr. Buffaloe a letter from his attorney, which contained a demand that Hutchins be reinstated to active employment. In the letter, Hutchins' attorney stated that Hutchins had been conducting an investigation related to his charge of employment discrimination so that Hutchins could respond to a letter Hutchins had received from the Idaho Human Rights Commission about his complaint. The attorney also said that Hutchins "did not discuss his complaint or solicit information from direct reports over whom he might exert undue influence." Plaintiff's Ex. 3.

19. On July 14, 2010, Ms. Bickler was contacted by Matthew Sparks. Mr. Sparks worked in the same group as Ms. Bickler, also under Hutchins' direct supervision. Mr. Sparks told Ms. Bickler that Hutchins no longer needed a letter from her. He also said that the DirecTV Human Resources office was on a "witch hunt." Finally, he said that if he was

ever asked about the conversation he was having with her at that moment, he would deny that it occurred.

20.     Ms. Bickler told Mr. Buffaloe about the conversation with Mr. Sparks. At Mr. Buffaloe's request, she prepared a written summary of the conversation with Mr. Sparks and e-mailed it to Mr. Buffaloe.

21.     Mr. Sparks denied that this conversation with Ms. Bickler took place. His testimony in that regard was not credible, but Ms. Bickler's testimony concerning the conversation was credible. The Court finds that Mr. Sparks did engage in this conversation with Ms. Bickler. There is no persuasive basis to argue that Ms. Bickler had fabricated the fact of a conversation with Mr. Sparks, which he initiated. Further, the subject matter of the conversation was entirely consistent with the posture of the events taking place between Hutchins and DirecTV, and the fact that Hutchins had been placed on administrative leave the previous day.

22.     On July 15, 2010, an in-house attorney with DirecTV sent a letter in response to the July 13, 2010 letter from Hutchins' counsel. The letter contained a denial of the request to reinstate Hutchins to active employment. The letter further indicated that such a request would not be considered until DirecTV completed its investigation into the complaint made against Hutchins. The letter also invited Hutchins to participate in the investigation and directly respond to the allegations against him. Defendant's Ex. 501.

23.     On July 27, 2010, Hutchins told Mr. Buffaloe that he would participate in DirecTV's investigation. In an interview with Mr. Buffaloe that followed, Hutchins said he had requested letters from four fellow employees: Nathan Lease, Justin Sturgeon, Sherman

Williams, and Eva Bowman. (None of these individuals was directly supervised by Hutchins, but Mr. Lease, Mr. Sturgeon and Ms. Bowman were all Team Leaders.) He did not include Ms. Bickler in his list. He denied requesting a letter from any subordinate employee. At the end of the interview, Hutchins was told by Mr. Buffaloe that his leave would continue while the investigation was pending.

24. Mr. Buffaloe then interviewed Mr. Lease, Mr. Sturgeon, and Mr. Williams. (At that time, Ms. Bowman no longer worked at DirecTV.) Each confirmed that they had been contacted by Hutchins and had been asked to write a letter on his behalf.

25. Justin Sturgeon and Jeremy Punches both testified at the trial. Mr. Sturgeon was contacted by Hutchins at work in July 2010 about writing a supportive letter in connection with Hutchins' claim of discrimination. Mr. Sturgeon prepared the letter but never delivered it to Hutchins. Although Hutchins' request made him uncomfortable, Mr. Sturgeon did not feel threatened and knew he did not have to write any such letter.

26. Even though he had not been identified by Hutchins as one of the co-employees Hutchins had contacted, Jeremy Punches testified that he had been contacted by Hutchins in the team room at DirecTV. Hutchins asked Mr. Punches to write a letter detailing how Hutchins was in charge of a top performing team at DirecTV. Mr. Punches told Hutchins he would think about it but, ultimately, he never wrote the letter. Hutchins' request made Mr. Punches feel uncomfortable and conflicted, as he did not want to interject himself into the dispute between Hutchins and DirecTV. Although he testified that he did not feel threatened by Hutchins, he did feel that he would be letting Hutchins down if he did not write the letter.

**MEMORANDUM DECISION, FINDINGS, AND CONCLUSIONS - 9**

27.     Hutchins sent two e-mails to Mr. Lease on July 12, 2010, requesting that Mr. Lease write

        a letter in support of Hutchins.  The first e-mail detailed the topics he wanted Mr. Lease

        to discuss in such a letter.  In the second, Hutchins forwarded as an example a letter that

        James LaMancha, a former DirecTV employee, had written for Hutchins.  Defendant's

        Ex. 502.

28.     Hutchins also contacted and asked for letters from Josh Meyer and Jennifer Norvell (f/k/a

        Arocha).

29.     On July 30, 2010, Mr. Buffaloe informed Hutchins that the investigation was not yet

        completed.  A follow-up meeting was set for August 10, 2010.  The meeting might have

        occurred more quickly, but Hutchins was going on a previously planned vacation.

30.     Mr. Buffaloe interviewed the employees identified by Hutchins.  Before the scheduled

        August 10, 2010 meeting with Hutchins, Mr. Buffaloe talked to his own supervisor at

        DirecTV, Bill McAllister.  Mr. Buffaloe recommended to Mr. McAllister that Hutchins'

        employment be terminated for the reason that Hutchins had used his position as Team

        Manager to create a hostile environment for subordinate employees and because

        Hutchins had used poor judgment in asking for letters of support from direct reports.  Mr.

        McAllister agreed that Hutchins should be terminated from employment.

31.     On August 10, 2010, Mr. Buffaloe called Hutchins and told him there was no need for a

        meeting because Hutchins' employment was terminated.  Hutchins testified that he was

        told by Mr. Buffaloe that he was fired for harassing and intimidating an employee.

32.      The ADA participation clause supports this Court's finding that Hutchins was engaged

        in protected activity when he sought out letters of support from his coworkers.  A broad

construction of the participation clause does not permit a finding as argued and advanced by DirecTV, *i.e.*, that in order for his actions to be considered protected activity, there would have needed to be a specific request from the Idaho Human Rights Commission in its letter to Hutchins directing Hutchins to obtain letters of support from co-workers. It suffices that Hutchins had filed a claim of discrimination and was gathering information to support his claim, and such a finding is buttressed by the fact that Hutchins was responding to a letter from the IHRC which summarized DirecTV's response to his claim of discrimination, and in which the IHRC explicitly requested Hutchins to provide his own information to support his claim, in light of the DirecTV response.

33.     The Court finds that Hutchins did, in fact, request a letter from Ms. Bickler. He was untruthful when he testified that he had not done so. Nonetheless, neither the fact of his request nor the manner in which he requested the letter was confrontational in nature, and his actions cannot be subjectively described or objectively perceived, in any reasonable assessment, as threatening or intimidating. Accordingly, his conduct and his actions do not cause him to lose the protection afforded by the participation clause, even if one or more of the employees who were contacted felt uncomfortable about having been asked to write a letter that might support Hutchins' claim. They were free to say "no," or to consider further about whether they wanted to be involved, and, in fact, some of the persons he contacted chose not to do what Hutchins had asked of them.

34.     DirecTV was not justified in terminating Hutchins by giving undue and unjustified emphasis and credence to Ms. Bickler's subjective anxiety over the request made by Hutchins, when the evidence that was otherwise gathered by Mr. Buffaloe indicated

uniformly that the contacts made by Hutchins with Ms. Bickler and the other employees were made in a non-threatening manner, occurred during a break from workplace activities in a location away from the employee's usual workspace, and included a statement from Hutchins that the employee did not have to write a letter on his behalf.

35. Hutchins' conduct was not of a disruptive nature, and did not disrupt or impede the business goals or business operations of DirecTV.

36. The timing of Hutchins' requests, prior to the Calibration Review, also does not cause him to lose the protection of the participation clause. He received the letter from the IHRC at the end of June and shortly thereafter began to inquire of and seek letters of support from co-employees. There is no persuasive evidence in the record that Hutchins timed his requests to coincide with the Calibration Review, so as to somehow heighten the pressure upon his co-employees to respond favorably to his request. The fact of such a connection was as easily a matter of coincidence as intent on the part of Hutchins, and that fact must have been inescapably obvious to DirecTV.

37. The termination of Hutchins' employment was an adverse employment action.

38. But for Hutchins' protected activity, he would not have been terminated.

39. The fact that Hutchins requested letters from "subordinate level employees," among others, and that this occurred prior to a review process, does not alter the otherwise protected nature of such activity under the ADA. Only activity that is excessive or extremely disruptive to a business is not protected. Hutchins' conduct did not reach such a level.

40. Hutchins did not act in a manner that could be construed as intimidating or threatening

fellow employees regarding the statements of support that he requested.  The testimony

and evidence showed, instead, that he was professional and polite.  One employee, Ms.

Bickler, testified that she felt intimidated by his request, felt that it put her in a difficult

position, became worried by the request, and she brought the fact of his request and her

reaction to the request to the attention of the company.  However, it was the fact of his

request – not the manner in which he made the request – that made Ms. Bickler anxious

and upset, as she felt that she was being put between Hutchins and her employer.  That

scenario could be argued to exist in the context of any contact made by an employee of

another employee when engaged in protected activity concerning a claim of

discrimination.  The Court accepts that Ms. Bickler's concerns and emotional reaction to

the circumstances were likely genuinely felt, and does not find that there was any

motivation on her part to try to discredit Hutchins to gain her own advantage with her

employer, as Hutchins has argued in part.  However, the Court also concludes that Ms.

Bickler's emotional reaction to the request made by Hutchins, and her concerns that her

standing with the company was somehow at risk because of the request, were overblown

in the circumstances and were not justified by the facts.  Even if DirecTV was mindful of

trying to respond to her concerns, it could have done so by assuring her that her fears

were unfounded.  Instead, its decision to terminate Hutchins' employment gave an

unjustified and unwarranted credence to her concerns even though the circumstances

could not possibly justify the measure of Ms. Bickler's negative reaction to Hutchins'

request.  Hutchins told Ms. Bickler that she had no obligation to write such a letter, and

his conversation with her was matter-of-fact and cordial, occurred away from her

workspace, and during a break period. DirecTV was not justified in using Ms. Bickler's unreasonable and hyper-sensitive response to his request as a basis upon which to fire Hutchins. On the facts of this record, a single employee's disproportionate negative response to the mere fact of a contact from a fellow employee seeking a letter of support to assist in responding to a request from an agency dealing with a discrimination complaint does not justify the employer's decision to terminate that employee, particularly when the employer's investigation reveals that other employees who were also contacted under similar circumstances did not share the same overwrought concerns. Otherwise, the ability of an employee to pursue otherwise protected activity in seeking information and support in order to prosecute a claim of discrimination would be severely limited, if not eviscerated, even though Congress intended to protect such activity in enacting the ADA.

41.    The Court finds that DirecTV did not have a honest, good faith, belief that Hutchins was intimidating fellow employees. The facts cannot possibly support such a position. Regardless of whether Ms. Bickler subjectively felt as though she was intimidated by her conversation with Hutchins, the manner in which Hutchins approached all the employees to whom he spoke was professional and polite. Even Ms. Bickler said so. There was no groundswell of fellow employees feeling threatened or intimidated by Hutchins' contacts with them. DirecTV's decision to terminate Hutchins based on one employee's subjective reaction of somehow being "placed in the middle" cannot constitute an honest, good faith belief that Hutchins was seeking to intimidate fellow employees to support his discrimination claim. Neither can DirecTV's assertion that Hutchins used poor judgment

in making such actions stand up against a fair scrutiny, particularly in the setting of an employee seeking to obtain information to support his claim of discrimination. Hutchins acted in an even-handed manner, he made certain to have his conversations while he and the other employees were on a break, he had such conversations outside the presence of other employees, and he told the persons he contacted that they did not have to write such a letter.

42.     Hutchins would not have been terminated from his employment but for his protected activity in contacting other employees to ask for letters to help him support his discrimination claim against DirecTV.

43.     At the time of his termination from employment, Hutchins' salary was $62,545 per year.

44.     DirecTV contributed $14,504 annually to Hutchins' health benefits and $8,756 annually in retirement benefits at the time of his termination.

45.     At all relevant times to his claims in this case, Hutchins and his family resided in Meridian, Idaho. Hutchins has a wife and four school age children.

46.     Even before his firing, Hutchins had been looking for other employment and had applied for a job at T-Mobile. Hutchins testified he did so because he thought DirecTV might "retaliate" against him, but the Court does not find such testimony credible.

47.     The Court concludes from its careful review and consideration of the evidence at trial, and finds by a preponderance of such evidence, that Hutchins would not have remained in the employ of DirecTV for more than the remainder of the calendar year 2010 and the calendar year 2011. Hutchins, even independent of the protected activity in which he was involved as part of the employment discrimination complaint he had filed against

DirecTV, was a discontented, unhappy, employee who had been untruthful with his employer, all of which created a scenario by which he was almost certain to leave DirecTV in the near future. In support of that conclusion, the Court relies in part upon the evidence that:

1. Hutchins had begun to look for other employment prior to his termination and kept an updated resume on Career Builder while he was employed with DirecTV;

2. Hutchins and his employer had a strained relationship, in that Hutchins was unhappy and discontented that he had not been selected for several possible promotions that he had sought;

3. Hutchins lied to his employer DirecTV about important details of the contacts he had made with other employees as part of his efforts to obtain letters supporting the claim of discrimination, including the numbers and names of those persons he had contacted, and whether any of them directly reported to him.

4. Hutchins recruited another employee, Matt Sparks, to make contact with Ms. Bickler after she had made a complaint about his contact with her. There was no purpose for Hutchins''s enlistment of Mr. Sparks to contact Ms. Bickler, other than to deflect any potential problems he might have created for himself by talking to her in the first instance.

48. After his termination, Hutchins immediately intensified his job search via online job search engines, such as Career Builder. On August 24, 2010, Hutchins posted a letter outlining his experience, interests, and job expectations, along with a copy of his resume, on the Career Builder website. The Career Builder website is an internet job search and

job recruiter resource used by both job seekers and employers. The resume posted by Hutchins contained material falsehoods about his education, including a false representation that he had earned and received a college degree. Additionally, he had previously posted his resume on the Career Builder website, even before he was terminated from DirecTV.

49. Hutchins looked for employment in the area of the Treasure Valley, in southwest Idaho.

50. Hutchins' job search efforts consisted of searching for jobs online and word of mouth of possible openings from family and friends. He looked for managerial sales positions, predominantly in call centers.

51. In late November or early December 2010, Hutchins decided to become an independent insurance agent for Farmers Insurance Company ("Farmers"). At that time, he discontinued his job search for other types of positions.

52. Hutchins earned no income in 2010 at Farmers. In 2011, he earned $15,420.

53. Hutchins paid $6,168 annually for health insurance once employed at Farmers.

54. Hutchins' decision to begin work at Farmers was not a "voluntary removal from the job market."

55. There was no evidence of "substantially equivalent employment" available to Hutchins.

## CONCLUSIONS OF LAW

1. During the period of his employment with DirecTV, Hutchins was entitled to rights provided by the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and the Idaho Human Rights Act ("IHRA"), I.C. § 67-5901 *et seq.* During his employment, DirecTV was an "employer" as that term is defined by the ADA (42 U.S.C.

§ 12111(5)(A)) and the IHRA (I.C. § 67-5902(6)).

2.      Pursuant to 42 U.S.C. § 12203(a), the ADA prohibits retaliation against an employee because the employee made "a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the ADA.  Retaliation claims under the ADA are adjudicated under the same framework as Title VII retaliation claims, 42 U.S.C. § 2000e-3.  *See Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1120 (9th Cir. 2000) *vacated on other grounds sub nom, U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

3.      IHRA's anti-retaliation provision, found at I.C. § 67-5911, is identical to federal law. Federal law provides guidance in considering such claims.  *Frogley v. Meridian Joint School Dist. No. 2*, 314 P.3d 613, 619 (Idaho 2013).

4.      To prove his ADA retaliation claim, Hutchins must show by a preponderance of the evidence that: (1) he engaged in or was engaged in activity protected by the ADA, (2) DirecTV subjected him to an adverse employment action, and (3) there was a causal link between the protected activity and DirecTV's adverse employment action.  *Brown v. City of Tucson*, 336 F.3d 1181, 1186-87 (9th Cir. 2003).

5.      Retaliation can be established under the traditional principles of "but-for" causation by showing that the unlawful retaliation would not have occurred in the absence of the alleged wrongful actions of his employer.  *Univ. of Texas Southwestern Medical Center v. Nassar*, – U.S. –, 133 S.Ct. 2517, 2534 (2013).

**Hutchins was Engaged in Protected Activity**

6.      The ADA prohibition of retaliation against an employee who has "participated in any manner in an investigation, proceeding, or hearing" is known as the "participation

clause."

7.      The purpose of the section 2000e-3 participation clause "is to protect the employee who utilizes the tools provided by Congress to protect his rights." *Vasconcelos v. Meese*, 907 F.2d 111, 113 (9th Cir. 1990) (quoting *Sias v. City of Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978)).

8.      The participation clause offers broad protection and is to be construed accordingly. *See Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988) ("participation clause is broadly construed to protect employees who utilize the tools provided by Congress to protect their rights").

9.      A broad construction of the ADA participation clause supports this Court's finding that Hutchins was engaged in protected activity when he sought out letters of support from his coworkers. A broad construction of the participation clause does not permit a finding as argued and advanced by DirecTV, *i.e.*, that the letter from the IHRC to Hutchins would have needed to expressly and specifically direct Hutchins to obtain letters of support from individuals in order for his conduct in seeking such letters of support to be considered protected activity. It suffices that Hutchins had filed a claim of discrimination and was gathering information to support his claim, and such a finding is buttressed by the fact that Hutchins was responding to a letter from the IHRC which summarized DirecTV's response to his claim of discrimination, and which explicitly requested Hutchins to provide his own information to the IHRC in light of the DirecTV response.

10.     The record contains a preponderance of persuasive evidence that Hutchins had a good faith belief that he was engaged in protected activity. As such DirecTV's belief that he

was engaged in "bad faith behavior" is not a sufficient defense. *See Sanders v. Madison Square Garden, L.P.*, 525 F. Supp. 2d 364 (S.D.N.Y. 2007). If Hutchins' conduct was excessive and deliberately calculated to inflict needless economic hardship, he would lose the protection of the ADA. *See EEOC v. Kallirs, Phillips, Ross, Inc.*, 401 F. Supp. 66, 74 (D.C.N.Y. 1975). The trial record does not support such a conclusion, as further outlined to follow.

11.    The Court finds that Hutchins *did* in fact request a letter from Ms. Bickler, and that he was untruthful in his testimony when he denied having done so. Nonetheless, neither the fact of his request nor the manner in which he requested the letter was confrontational in nature, and could not have been subjectively described or objectively perceived, in any reasonable assessment, as threatening or intimidating. Accordingly, his conduct and his actions do not cause him to lose the protection afforded by the participation clause, even if one or more of the employees who were contacted felt uncomfortable about having been asked to write a letter that might support Hutchins' claim. They were free to say "no," or to consider further about whether they wanted to be involved. Indeed, a number of the persons contacted chose not to do what Hutchins had asked that they consider doing.

12.    The Court does not doubt Ms. Bickler's testimony that she was upset and felt intimidated after Hutchins approached her and requested a letter. However, a person who is hypersensitive, or who develops an unrealistic anxiety or concern or an otherwise unjustified reaction to a co-employee's request for assistance, cannot be the fulcrum for deciding whether a plaintiff's actions are no longer protected under the anti-retaliation

provisions of the ADA. If that were the basis for removing such protections, the intent of Congress in enacting such protections for potentially aggrieved workers would become contingent upon the vagaries of the potential fragility of a coworker's emotional state and personal sensitivities, rather than whether a plaintiff's conduct was beyond the realm of otherwise protected activity.

13. DirecTV was not justified in terminating Hutchins, because DirecTV gave undue and unjustified emphasis and credence to Ms. Bickler's subjective anxiety over the request made by Hutchins, when the evidence that was otherwise gathered by Mr. Buffaloe indicated uniformly that the contacts made by Hutchins with Ms. Bickler and the other employees were made in a non-threatening manner, occurred during a break from workplace activities in a location away from the employee's usual workspace, and included a statement from Hutchins that the employee did not have to write a letter on his behalf.

14. The timing of Hutchins' requests, prior to the Calibration Review, does not cause him to lose the protection of the participation clause. He received the letter from the IHRC at the end of June and shortly thereafter, began to inquire of and seek letters of support from co-employees. The fact that his contacts occurred roughly contemporaneously to the Calibration Review was inescapable, given the coincidence of the timing of his receipt of the letter from the Idaho Human Rights Commission and the already scheduled Calibration Review process. Such a coincidence, without more, cannot support a conclusion that Hutchins was seeking to leverage his request for a letter of support with the fact of the review process.

**MEMORANDUM DECISION, FINDINGS, AND CONCLUSIONS - 21**

15. In sum, while there are situations where courts have found that a plaintiff's conduct exceeds the statutory protection offered by the anti-retaliation provision, this case is not one. Hutchins' conduct was not of a disruptive nature nor did he impede the goals of DirecTV. *See Wrighten v. Metro. Hosps., Inc.*, 726 F.2d 1346, 1355 (9th Cir. 1984).

**Hutchins' Termination was an Adverse Employment Action**

16. Adverse employment action is any action "reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). Adverse employment decisions include actions that materially affect compensation, terms, conditions or privileges of employment. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2002). "Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion." *Brooks v. City of San Mateo*, 229 F.3d 917, 928-29 (9th Cir. 2000).

17. The termination of Hutchins' employment was an adverse employment action.

**Hutchins Would Not Have Been Terminated But For His Protected Activity**

18. Retaliation claims require proof by a preponderance of the evidence that the adverse employment action would not have occurred "but for," or in the absence of, the protected activity. *See Nassar*, 133 S.Ct. at 2533.

19. By a preponderance of the evidence, the Court is persuaded that but for Hutchins' protected activity, he would not have been fired.

20. Similarly, and for the same reasons, the Court finds that DirecTV violated I.C. § 67-5911

in retaliating against an "individual because he or she has opposed any practice made unlawful by [the Idaho Human Rights Act.]"  *See Frogley*, 314 P.3d 613, 619 (Idaho 2013)

21.     These findings are supported by numerous facts, as detailed to follow.

22.     The decision to place Hutchins on leave, and then to fire him, came on the heels of Hutchins' protected activity, *i.e.* shortly after Hutchins asked for letter statements from his coworkers in support of his charge of discrimination.  *See Hubbard v. Georgia Farm Bureau Mut. Ins. Co.*, 2013 WL 3964908, *1 (M.D. Ga. July 13, 2013); *Taylor v. Republic Servs., Inc.*, 2013 WL 5178452, *24 (E.D. Va. Sept. 16, 2013).

23.     DirecTV became aware of Hutchins' requests for such letters on July 8, 2010.  Hutchins was fired on August 10, 2010.  Only 28 days went by between DirecTV learning about Hutchins' requests for statements from his coworkers and his firing, and a goodly portion of that period was consumed by a previously planned vacation taken by Hutchins.[1]  This relatively short period of time is strong evidence that if Hutchins had not been requesting letters of support from his co-workers, a protected activity under the ADA, he would not have been fired.

24.     Mr. Buffaloe said that the decision was "based upon [Hutchins'] conduct in requesting the letters from subordinate level employees."  Plaintiff's Ex. 9 (Buffaloe Decl.).

25.     The fact that Hutchins requested letters from "subordinate level employees," among others, does not alter the otherwise protected nature of such activity under the ADA.

---

[1]  In the interim, on July 13, 2010, Hutchins was placed on paid administrative leave.  As previously held in this case, the act of placing him on such leave, by itself, was *not* an adverse employment action.

Only activity that is excessive or extremely disruptive to a business is not protected. Hutchins' conduct did not reach such a level.

26.     Hutchins did not act in a manner that could be construed as intimidating or threatening fellow employees regarding the statements of support that he requested. The testimony and evidence showed, instead, that he was professional and polite. One employee, Ms. Bickler, testified that she felt intimidated by his request, felt that it put her in a difficult position, became worried by the request, and she brought the fact of his request and her reaction to the request to the attention of the company. However, it was the fact of his request – not the manner in which he made the request – that made Ms. Bickler anxious and upset, as she felt that she was being put between Hutchins and her employer. That scenario could be argued to exist in the context of any contact made by an employee of another employee when engaged in protected activity concerning a claim of discrimination. The Court accepts that Ms. Bickler's concerns and emotional reaction to the circumstances were likely genuinely felt, and does not find that there was any motivation on her part to try to discredit Hutchins to gain her own advantage with her employer, as Hutchins has argued in part. However, the Court also concludes that Ms. Bickler's emotional reaction to the request made by Hutchins, and her concern that her standing with the company was somehow at risk because of the request, were overblown in the circumstances and were not justified by the facts. Even if DirecTV was mindful of trying to respond to her concerns, it could have done so by assuring her that her fears were unfounded. Instead, its decision to terminate Hutchins' employment gave an unjustified and unwarranted credence to her concerns even though the circumstances

could not possibly justify the measure of Ms. Bickler's negative reaction to Hutchins' request. Hutchins told Ms. Bickler that she had no obligation to write such a letter, and his conversation with her was matter-of-fact and cordial, occurred away from her workspace, and during a break period. DirecTV was not justified in using Ms. Bickler's unreasonable and hyper-sensitive response to his request as a basis upon which to fire Hutchins. On the facts of this record, a single employee's disproportionate negative response to the mere fact of a contact from a fellow employee seeking a letter of support to assist in responding to a request from an agency dealing with a discrimination complaint does not justify the employer's decision to terminate that employee, particularly when the employer's investigation reveals that other employees who were also contacted under similar circumstances did not share the same overwrought concerns. Otherwise, the ability of an employee to pursue otherwise protected activity in seeking information and support in order to prosecute a claim of discrimination would be severely limited, if not eviscerated, even though Congress intended to protect such activity in enacting the ADA.

27. DirecTV did not prove a separate, non-retaliatory reason for terminating Hutchins. Hutchins was terminated because he requested letters from fellow employees, including subordinate level employees, which was protected activity.

28. In making this holding, the Court is not acting a "super-personnel department" as has been cautioned against. *See, e.g. Simms v. Oklahoma v. Dep't of Mental Health and Substances Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999) (implied overruling on other grounds by *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).

Instead, the Court is holding that on these facts, for the reasons described above, DirecTV was not justified in making the decision to terminate Hutchins' employment.

29. In *Simms*, a fired firefighter brought Title VII race discrimination and retaliation claims and claimed the reason he was not promoted was because of his race. 165 F.3d 1321 (10th Cir. 1999). The court held that "[w]hen two candidates are equally qualified in that they possess the objective qualifications for the position and neither is clearly better qualified, it is within the employer's discretion to choose among them so long as the decision is not based on unlawful criteria." *Id*. at 1330. As such, the Court is not to second guess business judgments, but rather to prevent unlawful conduct. In applying the reasoning of *Simms* to the facts before the Court, DirecTV can choose whose employment to terminate. But what DirecTV *cannot* do is fire someone for an improper reason and unlawful criteria under the law, such as engaging in protected activity. That is unlawful retaliation.

30. DirecTV has asserted, in the past, that its decision to terminate Hutchins did not run afoul of the ADA's anti-retaliation provision because it honestly believed he had intimidated an employee, particularly in light of the upcoming Calibration Review. *See Odima v. Westin Tucson Hotel Co.*, 991 F.2d 595, 602 (9th Cir. 1993) ("district court must not substitute its own judgment about whether the employment decisions were wise, or even fair, for that of the employer.") *See Rivera v. City and County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) ("The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs.")

31.     The Court finds that DirecTV did not have a honest, good faith, belief that Hutchins was intimidating fellow employees.  The facts simply do not support such an argument.  Regardless of whether Ms. Bickler subjectively felt as though she was intimidated by her conversation with Hutchins, the manner in which Hutchins approached all the employees he spoke to was professional and polite.  Even Ms. Bickler testified as such.  No other employees complained of being threatened or feeling intimidated.  DirecTV's decision to terminate Hutchins based on one employee's subjective reaction of somehow being "placed in the middle" cannot constitute an honest, good faith belief that Hutchins was seeking to intimidate fellow employees to support his discrimination claim.  Neither can DirecTV's assertion that Hutchins used poor judgment in making such actions stand up against a fair scrutiny, particularly in the setting of an employee seeking to obtain information to support his claim of discrimination.  Hutchins acted in an even-handed manner, he made certain to have his conversations while he and the other employees were on a break, he had such conversations outside the presence of other employees, and he told the persons he contacted that they did not have to write such a letter.

32.     The protection afforded by the anti-retaliation provision is broad.  Hutchins' conduct clearly falls within the statute.  DirecTV cannot take an adverse employment action against an employee such as Hutchins for engaging in protected activity.

33.     As the court recognized in *Sanders*, DirecTV's belief that Hutchins was engaging in "bad faith behavior" is not a defense to an ADA retaliation claim.  *Sanders v. Madison Square Garden, L.P.*, 525 F. Supp. 2d 364, 367 (S.D.N.Y. 2007).  When an employer terminates an employee because it believes the employee's complaint of discrimination is without

merit or even malicious, as long as the employee is acting in good faith in bringing such a complaint, the employer "must tolerate such complaints, and not retaliate because of them." *Id*. When an employer chooses to fire an employee "for making false or bad faith accusations, he does so at his peril . . ." *Id*.

34.     In applying the rationale of *Sanders* to the facts here, Hutchins was absolutely protected in seeking statements from his fellow employees. However, had he been acting in bad faith and actually intimidating and threatening employees, he could lose the protection. The facts do not support such a finding.

35.     DirecTV has asserted the defense of "unclean hands" and contends Hutchins should be barred from equitable relief because he failed to fully disclose all the names of the Team Leaders from whom he had requested a letter. The Court finds that the defense of unclean hands is not applicable here.

36.     The doctrine of unclean hands requires that those seeking the Court's protection "have acted fairly and without fraud or deceit as to the controversy in issue." *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985). "What is material is not that the plaintiff's hands are dirty, but that he has dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant." *Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 349 (9th Cir. 1963).

37.     There is some question as to whether the defense of unclean hands applies in ADA actions. *See Kohler v. Islands Restaurants, LP*, 280 F.R.D. 560 (S.D. Cal. 2012) (discussing the Supreme Court decision *McKennon v. Nashvillege Banner Publ'g Co.*,

513 U.S. 352, 360 (1995) which recognized that the unclean hands defense is inappropriate to consider against the equitable relief provided by Congress to serve important national policies).

38.   However, even if the defense of unclean hands is properly raised on these facts, DirecTV has not met its burden of showing by a preponderance of persuasive evidence that Hutchins acted with fraud or deceit, and that the fraud or deceit *gave rise to the right asserted*. DirecTV is correct, and has shown, that Hutchins was dishonest in some of his statements made in response to DirecTV's investigation and otherwise, and did not give the names of all the individuals he contacted for letters. However, the conduct did not *give rise* to the right he asserts, that is, the right to protection from retaliation for engaging in protected conduct, and in any event, on balance does not rise to the level where equity would require that he be precluded from seeking the relief sought in this case because of his own less than sterling choices.

**Hutchins Will Be Awarded Back Pay**

39.   Under 42 U.S.C. § 2000e-5(g)(1), if the Court finds that the defendant engaged in retaliation, "the court may enjoin the [defendant] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay, . . . or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1). "Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall

operate to reduce the back pay otherwise allowable." *Id*.

40. Back pay awards "advance 'Congress' intent to make "persons whole for injuries suffered through past discrimination." ' " *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1020 (9th Cir. 2000) (quoting *Loeffler v. Frank*, 486 U.S. 549, 558 (1988) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)).  Accordingly, "once a court finds unlawful [retaliation], backpay should be denied only if denial 'would not frustrate the central statutory purposes of eradicating discrimination through the economy and making persons whole for injuries suffered through past discrimination.'" *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986) (quoting *Albemarle Paper*, 422 U.S. at 421).

41. Hutchins has prevailed on his ADA retaliation claim.  The Court is also persuaded, by a preponderance of the evidence, that DirecTV's actions were in direct response to Hutchins''s protected activity, that the purported basis for his termination related specifically to Hutchins'protected activity, and therefore, it is inescapable that DirecTV intended the action it took in terminating Hutchins to be in response to his protected activity.  Accordingly, DirecTV intended to and did retaliate against Hutchins, and the Court must order a remedy.

42. Under the factual record of this case, the Court finds that reinstatement is not an appropriate remedy.  For a multiplicity of reasons from the trial record, which are more fully described to follow, the Court is persuaded by a preponderance of the evidence that Hutchins would *not* have remained in the employment of DirecTV for an extended period of time, even had he not been terminated.  There is no purpose to be served consistent

with the intent of Congress in enacting the ADA by reinstating Hutchins to his former position. Rather, in the discretion of the Court for the reasons described *passim* in this decision, the appropriate remedy is back pay, in an amount as justified in the circumstances of Hutchins' departure from his job at DirecTV.

43. Back pay is calculated by subtracting the actual wages a discharged employee earned subsequent to termination (if any) from the amount the employee would have earned absent the employer's discriminatory conduct. *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1158 (9th Cir. 1999).

44. Absent compelling circumstances, back pay is typically computed from "the date of discriminatory act until the date of final judgment." *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986).

45. In some factual circumstances, it is not appropriate to award back pay from end-to-end. The most common are: (1) a failure to mitigate against the loss of wages; (2) reemployment in a "substantially equivalent" position; (3) refusal of offer of reinstatement; (4) after-acquired evidence of the plaintiff's misconduct or fraud; or (5) an individual's voluntary decision to withdraw from the labor market. *See* 135 A.L.R. Fed. 1 (1996) (discussing reductions to awards of back pay). This case also presents factual circumstances which do not justify an award of back pay from end-to-end.

46. In considering the totality of the evidence before the Court at trial and the purpose of the equitable remedy of back pay in making Hutchins "whole," the Court is persuaded by a preponderance of the evidence that Hutchins in entitled to an award of back pay from the effective date of his termination, August 11, 2010, through December 31, 2011.

47.     The Court is persuaded and finds by a preponderance of the evidence at trial, that

Hutchins would not have remained in the employ of DirecTV for more than the

remainder of the calendar year 2010 and the calendar year 2011.  Hutchins, even

independent of the protected activity in which he was involved as part of the employment

discrimination complaint he had filed against DirecTV, was a discontented, unhappy,

employee who had been untruthful with his employer, all of which created a scenario by

which his employment with DirecTV was certain to end in the foreseeable near future.  In

support of that conclusion, the Court relies in part upon the evidence that:

1.      Hutchins had begun to look for other employment prior to his termination and

kept an updated resume on Career Builder while he was employed with DirecTV;

2.      Hutchins and his employer had a strained relationship, in that Hutchins was

unhappy and discontented that he had not been selected for several possible

promotions that he had sought;

3.      Hutchins lied to his employer DirecTV about important details of the contacts he

had made with other employees as part of his efforts to obtain letters supporting

his claim of discrimination, including the full details of who had been contacted

and whether any of those persons directly reported to him;

4.      Hutchins recruited another employee, Matt Sparks, to make contact with Ms.

Bickler after she had made a complaint about his contact with her.  There was no

purpose for Hutchins' enlistment of Mr. Sparks to contact Ms. Bickler, other than

to deflect any potential problems he might have created for himself by talking to

her in the first instance.[2]

48.    Awarding back pay through the end of 2011 satisfies the purpose behind back pay – to make the plaintiff whole.  Hutchins would not have remained in the employment of DirecTV beyond December 31, 2011.  Therefore, the purpose of back pay under the Congressional intent in enacting the ADA is not served by giving him an award of back pay beyond that date.[3]  To do so would yield Plaintiff an unjustifiable windfall.

49.    The Court is persuaded by the testimony of Plaintiff's economist expert, Dr. Bowles, in determining the amount of lost wages from Hutchins' date of termination through the end of 2011.  *See* Plaintiff's Trial Ex. 8.  Dr. Bowles opined that the amount of lost wages for the remainder of 2010 and 2011 was $57,921.  *See id.*  This amount was calculated by deducting Hutchins' actual earnings for the remainder of 2010 and 2011 from his DirecTV salary.[4]

---

[2]  As described elsewhere in this decision, Hutchins' conduct in talking to Ms. Bickler was protected activity under the ADA.  However, his conduct in working with Mr. Sparks to try to quiet Ms. Bickler after she had complained to the DirecTV human resources department about his contact with her is something else entirely.  His decision to do so reflects poor judgment and questionable motives, all of which are further evidence of an unhealthy employee/employer relationship, and an employment relationship not likely to last.

[3]  The Court is mindful that it is impossible to identify what would have happened in these circumstances with Hutchins' employment at DirecTV had he not been terminated.  Therefore, it is similarly impossible to identify the particular date on which his employment would have ended.  In those circumstances, the Court is left do what any factfinder is left to do – determine from the evidence which of several scenarios is most probable based upon all of the evidence.  Here, the Court is persuaded by a preponderance of the evidence that December 31, 2011 is the date by which Hutchins would no longer be working at DirecTV.

[4]  The Court is not persuaded by Mr. Hofman's testimony that called for a "normal work interruption" percentage to reduce the amount of lost wages and did not include that in its calculation.  Nor is the Court persuaded that Hutchins' award should be "grossed up" to account for tax consequences, as suggested by Dr. Bowles.

**MEMORANDUM DECISION, FINDINGS, AND CONCLUSIONS - 33**

50.     Back pay may include the loss of fringe benefits, such as health insurance. *See, e.g., U.S.*

*v. City of New York*, 847 F. Supp. 2d 395, 409 (E.D.N.Y. 2012). "[W]here an

employee's fringe benefits include medical and life insurance, a plaintiff should be

compensated for the loss of those benefits if the plaintiff has purchased substitute

insurance coverage or has incurred, uninsured, out-of-pocket medical expenses for which

he or she would have been reimbursed under the employer's insurance plan." *Galindo v.*

*Stoody Co.*, 793 F.2d 1502, 1516-17 (9th Cir. 1986). *See, also, E.E.O.C. v. Farmer Bros.*

*Co.*, 31 F.3d 891, 902 (9th Cir. 1994) (applying the *Galindo* holding to a Title VII case).

51.     The Court will accept the calculation of the value of lost health insurance benefits made

by Dr. Bowles only as to the cost of such insurance benefits at DirecTV for the remainder

of 2010, for a total of $4,834.

52.     The Court accepts the opinion evidence of DirecTV's expert economist, Mr. Hofman,

that Hutchins obtained other health insurance beginning in January of 2011 at a monthly

premium cost of $514, or $6,168 annually. Defendant's Ex. 515, p. 7. Therefore,

Hutchins' lost health insurance benefits for 2011 were $6,168.[5]

53.     Hutchins is entitled to recover the amount of retirement account contributions DirecTV

would have made for his benefit, had he not been terminated. *See, e.g., Buonanno v.*

*AT&T Broadband, LLC*, 313 F.Supp.2d 1069, 1083 (D. Colo. 2004); *Viveros v. Donahoe*,

2012 WL 6021667, *8 (C.D. Cal. Nov. 30, 2012). The Court is persuaded by the

evidence put forward by Hutchins on this subject through Dr. Bowles, which calculates a

---

[5] The Court takes into account the $6,168 annual premium only for the 2011 calendar
year, as Hutchins began working as an agent for Farmers Insurance Company at the end of 2010.
The new health insurance coverage began contemporaneously with that change in his career.

total lost retirement benefits amount of $10,267. *See* Plaintiff's Ex. 8, Table 2.

54.    Under the ADA, a district court is authorized to grant prejudgment interest on a backpay award. *See Loeffler v. Frank*, 486 U.S. 549, 558-58 (1988); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1446 (9th Cir. 1984). The interest rate used to calculate prejudgment interest is within the discretion of the trial judge. *W. Pac. Fisheries, Inv. v. SS President Grant*, 730 F.2d 1280, 1288 (9th Cir.1984). This discretion must be exercised with a view to the fact that prejudgment interest is an element of compensation, not a penalty. *Id.*

55.    The Court finds that such an award of prejudgment interest is justified in this case because it will place Hutchins in the position he would have been in had he not been terminated and compensates him for the time he was denied use of the income.

56.    "Generally, the interest rate prescribed for post judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of prejudgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate. " *Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007) (internal citation and quotation omitted).

57.    Accordingly, Plaintiff is entitled to a back pay award of $79,190, plus prejudgment interest at the rate prescribed by 28 U.S.C. § 1961.

**Hutchins Will Not be Awarded Front Pay**

58.    The remedies of reinstatement and front pay are equitable remedies left to the discretion of the court. *See Traxler v. Multnomah County*, 596 F.3d 1007 (9th Cir. 2010). While reinstatement sometimes may be a preferred remedy, front pay is "appropriate when it is

impossible to reinstate the plaintiff or when it would be inappropriate due to excessive hostility or antagonism between the parties." *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986) (citing *Fahdl v. City and County of San Francisco*, 741 F.2d 1163, 1167 (9th Cir. 1984)).

59.     Front pay is intended to be a temporary award. *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1347 (9th Cir. 1987). Additionally, because there is a potential for windfall, the use of front pay must be tempered. *Gotthardt*, 191 F.3d at 1157 (quoting *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991)).

60.     There are several factors courts have considered in determining the propriety of an award of front pay: (1) an employee's duty to mitigate; (2) the availability of other employment opportunities; (3) the period within which one by reasonable efforts may be re-employed; (4) the employee's work and life expectancy; (5) the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damage awards; (6) the length of prior employment; (7) the permanency of the position held; (8) the nature of the work; (9) the age and physical condition of the employee, (10) possible consolidation of jobs; and (11) the myriad other non-discriminatory factors that could validly affect the employer/employee relationship. *See Lane v. Grant County*, 2013 WL 5306986, *8 (E.D. Wash. Sept. 20, 2013).

61.     The Court finds neither reinstatement nor front pay is appropriate in this case. In accord with the Court's reasoning previously described as to why back pay should not be awarded past the end of calendar year 2011, the Court also will not award front pay in this case. For the reasons previously described, Hutchins would not have remained

employed at DirecTV under any circumstances beyond the end of 2011.  Accordingly, front pay is not appropriate.

62.     The Court finds that given the totality of the circumstances and by a preponderance of the relevant evidence, the back pay award of $79,190 plus prejudgment interest suffices to make Hutchins "whole."

**DirecTV Has Not Proven that Hutchins Failed to Mitigate Damages**

63.     DirecTV has raised the affirmative defense of failure to mitigate damages.

64.     A plaintiff seeking an award of back pay or front pay has a duty to mitigate damages by making reasonably diligent efforts to obtain alternative employment.  *Caudle*, 224 F.3d at 1020 (citing 42 U.S.C. § 2000e-5(g)(1)).  *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982).

65.     DirecTV has the burden of proving that plaintiff failed to mitigate damages.  *Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980).  To meet this burden, DirecTV must establish: "(1) that the damages suffered by plaintiff could have been avoided, *i.e.*, that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that the plaintiff failed to use reasonable care and diligence in seeking such a position."  *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978).

66.     "Substantially equivalent employment is employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status . . ."  *Lyle v. Desert Springs Hosp.*, 2012 WL 6562033, *6 (D. Nev. Dec. 14, 2012) (quoting *Hughes v. Mayoral*, 721 F.Supp.2d 947, 967 (D. Hawaii 2010)).  *See also*

*Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990).

67.     DirecTV has not met its burden of establishing failure to mitigate.  Specifically, DirecTV did not put on ultimately persuasive evidence that there were "suitable positions available which plaintiff could have discovered and for which he was qualified."  Without such proof of comparable employment available to Hutchins, DirecTV cannot prevail on this defense.  *See Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995) (where employer presented no evidence as to the availability of comparable employment, district court did not abuse its discretion in finding employer failed to meet its burden in establishing the failure to mitigate defense).

68.     Further, DirecTV's argument that Hutchins failed to mitigate and removed himself from the labor market when he embarked on a new career path of selling insurance fails.  Self-employment, if it is undertaken in good faith and is a reasonable alternative to seeking other comparable employment, may be considered permissible mitigation.  *See, e.g., Smith v. Great American Restaurants, Inc.*, 969 F.2d 430, 438 (7th Cir. 1992) ( jury could conclude that plaintiff's opening of her own restaurant was a reasonable venture); *Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1005 (3d Cir. 1988) ("[A] self-employed person is 'employed' for the purposes of mitigating damages if establishing a business of his own was a reasonable alternative to finding other comparable employment.").

69.     The Court finds that Hutchins' decision to embark on a new career path and go into the insurance business was reasonable in the circumstances, particularly given the significant economic downturn occurring in the time period of his job search, and constitutes mitigation of damages.

70.    Hutchins' decision to go into the insurance business was not a "voluntary removal from

the labor market" that cuts off back pay as DirecTV contends.  *See, e.g., Cassella v.*

*Mineral Park, Inc.*, 2010 WL 454992, *8 (D. Ariz. Feb. 9, 2010) (distinguishing between

attending law school full time or serving in the military and a civilian who is self-

employed.  The latter is in the labor market and "such persons, with few exceptions are

capable of ending their employment in favor of another job opportunity.")

**Hutchins Will Not Receive Additional Damages under the IHRA**

71.    Damages for violation of the Idaho Human Rights Act are outlined in Idaho Code § 67-

5908 and include: "(a) An order to cease and desist from the unlawful practice specified

in the order; (b) An order to employ, reinstate, promote or grant other employment

benefits to a victim of unlawful employment discrimination; (c) An order for actual

damages including lost wages and benefits, provided that such back pay liability shall not

accrue more than two (2) years prior to the filing of the complaint with the commission

or the district court, whichever occurs first; (d) An order to accept or reinstate such a

person in a union; (e) An order for punitive damages, not to exceed one thousand dollars

($1,000) for each willful violation of this chapter."  I.c. § 67-5908.  These damages are

the close mirror of the damages available under the federal ADA retaliation claim, except

that a claim for punitive damages can be pursued under Idaho law.

72.    Under these circumstances, the Court will not award additional damages under the IHRA

retaliation claim.  To do so would permit double counting for back pay.  They are fully

covered by the award made under the ADA.

73.    The Court will not award punitive damages.   It is likely that the IHRA, like the ADA,

does not allow for punitive damages on a retaliation claim. *See Velasco v. Broadway Arctic Circle, LLC*, 2012 WL 2505291, * 4-5 (D. Idaho June 28, 2012). Regardless, the array of proof at trial falls short of that needed to justify the extraordinary remedy of punitive damages. The purpose of punitive damages is to express the outrage of society at certain actions of the defendant, not to compensate the plaintiff. *Curtis v. Firth*, 850 P.2d 749, 759 (Idaho 1993). They are meant to punish, and "[i]n Idaho the punishment rationale is disfavored." *Id.*

74. The conduct of DirecTV in this case does not rise to the level of outrageousness which is necessary in part to justify an award of punitive damages.

## CONCLUSION

The Court finds, by a preponderance of the evidence, that DirecTV terminated the employment of Hutchins in retaliation for engaged in protected activity, specifically requesting letters in support of his charge of discrimination filed with the Idaho Human Rights Commission from his co-employees. By doing so, DirecTV violated the Americans with Disabilities Act, 42 U.S.C. § 12203(a), and the Idaho Human Rights Act, I.C. § 67-5911. The Court is not persuaded that DirecTV had a sufficient, honest, good faith reason for firing Hutchins so as to insulate its decision from a claim of retaliation.

Accordingly, the Court finds an award of back pay for the remainder of 2010 and 2011, and the value of related benefits, is the appropriate remedy. As detailed above, the Court is persuaded that Hutchins would not have remained employed at DirecTV longer than December 31, 2011 and that an award for this period of time suffices to make Hutchins whole, as envisioned by the equitable nature of remedies available under the ADA. Hutchins is to be

awarded back pay in the amount of $79,190, plus prejudgment interest.

## ATTORNEYS' FEES

If Plaintiff intends to pursue an award of attorneys' fees, he must file an appropriate

motion and supporting brief in accordance with Fed. R. Civ. P. 54(d) and the corresponding

Local Rule, within the time allowed after entry of judgment in this action.

DATED: **July 21, 2014**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge